**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 25-1350**

───────────────

RICHARD D. KELLY,

Plaintiff - Appellant,

v.

ALTRIA CLIENT SERVICES, LLC; DEFERRED PROFIT-SHARING PLAN FOR SALARIED EMPLOYEES; FIDELITY WORKPLACE SERVICES, LLC,

Defendants - Appellees.

───────────────

**No. 25-2080**

───────────────

RICHARD D. KELLY,

Plaintiff - Appellant,

v.

ALTRIA CLIENT SERVICES, LLC; DEFERRED PROFIT-SHARING PLAN FOR SALARIED EMPLOYEES; FIDELITY WORKPLACE SERVICES, LLC

Defendants - Appellees.

───────────────

Appeals from the United States District Court for the Eastern District of Virginia, at Richmond.  Henry E. Hudson, Senior District Judge.  (3:23−cv−00725−HEH)

───────────────

Argued:  May 6, 2026                    Decided:  August 10, 2026

_____

Before QUATTLEBAUM, BENJAMIN, and BERNER, Circuit Judges.

_____

No. 25-1350 affirmed in part, reversed in part, and remanded; No. 25-2080 affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Benjamin and Judge Berner joined.

_____

**ARGUED:** Richard F. Hawkins, III, HAWKINS LAW FIRM, PC, Richmond, Virginia, for Appellant. Michael Randolph Shebelskie, HUNTON ANDREWS KURTH LLP, Richmond, Virginia; Eric Douglas Field, LITTLER MENDELSON PC, Washington, D.C., for Appellees. **ON BRIEF:** Kevin S. Elliker, Alex B. Chumbley, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Appellees Altria Client Services, LLC and Deferred Profit-Sharing Plan for Salaried Employees. Alexander P. Berg, Steven J. Silver, LITTLER MENDELSON, P.C., McLean, Virginia, for Appellee Fidelity Workplace Services, LLC.

_____

2

QUATTLEBAUM, Circuit Judge:

Richard Kelly appeals the district court's order granting the defendants summary judgment on three claims. Each claim arises out of his effort to liquidate his account in a company benefit plan to take advantage of a stock market spike he expected after the 2020 election. In early November 2020, Kelly asked the plan's corporate record keeper to liquidate his account as soon as possible. But he also asked it to do so in a tax-friendly way. Kelly claims the liquidation did not take place in time for him to enjoy the stock market bump he predicted. And he claims that the record keeping firm misled him into thinking that he would have had access to the funds sooner. When he complained, the plan's administrator denied his claim.

Kelly then sued, alleging that denial unreasonably deprived him of his retirement plan benefits under ERISA[1] and that the misrepresentations about the time it would take to liquidate the funds amounted to a breach of fiduciary duty. On the denial of benefits claim, as the district court held, we must defer to the plan administrator so long as its decision was reasonable, and nothing in the record convinces us that it was not. On the breach of fiduciary duty claim, we also agree with the district court. The record keeping company was not a fiduciary and, even if it was, it did not breach any duties owed to Kelly.

---

[1] We use ERISA as shorthand for the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461, which "was enacted to protect the interests of participants in employee benefit plans and their beneficiaries by, among other things, 'establishing standards of conduct, responsibility, and obligation for fiduciaries of employment benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Marks v. Watters*, 322 F.3d 316, 322 (4th Cir. 2003) (quoting 29 U.S.C. § 1001(b)).

3

As to Kelly's third claim, he alleged that, despite his request, the plan administrator refused to provide him with a copy of the contract between the plan and the record keeping company in violation of 29 U.S.C. § 1024(b)(4). Here, we agree with Kelly that this contract was a document under which the plan was operated. So, we vacate that portion of the district court's order and remand for the district court to evaluate in the first instance whether any penalties for that violation are appropriate.

## I.

In 1983, Kelly began working at Philip Morris USA and later moved to its subsidiary Altria Client Services. In 2010, Kelly's job was eliminated as part of Altria's restructuring.

Kelly had a 401(k) account in Altria's Deferred Profit-Sharing Plan for Salaried Employees. He maintained the account after he stopped working there. The account consisted of three main types of assets: (1) Altria Group, Inc. stock; (2) a U.S. Index Fund—a fund designed to track the performance of the market; and (3) non-Altria stock— shares in companies affiliated with Altria, such as Philip Morris International Inc., Mondelez International, Inc. and The Kraft Heinz Company.

Leading up to the 2020 presidential election, Kelly predicted a post-election stock market bump. He wanted to liquidate various holdings in his 401(k) account, transfer the funds to a Goldman Sachs account and then invest them in a way that would take advantage of the market spike he expected. Kelly also wanted to take advantage of net unrealized appreciation rules for his non-Altria stock, which would provide him with tax benefits. And

Kelly wanted the proceeds of his account wired to Goldman Sachs, not sent to him by check.

Election Day was November 3, 2020. The day before, Kelly and his Goldman Sachs advisors called Fidelity Workplace Services, LLC, which was the corporate record keeper for the plan. Kelly told the Fidelity representative who answered the call about his intentions. To accomplish them, Kelly and Fidelity agreed on two intermediate steps—one, rolling over cash from liquidating the Altria stock and the U.S. Index fund into a Fidelity individual retirement account; and two, conducting an in-kind distribution of non-Altria stock to a Fidelity brokerage account.[2]

With the election one day away, Kelly wanted to do all of this as quickly as possible. He asked the Fidelity representative to sell the Altria and U.S. Index Fund holdings that day. The Fidelity representative said it would take two business days for the stock sale to settle, so Kelly should call back two days later to direct Fidelity to transfer his holdings into the individual retirement and brokerage accounts. From there, the representative said that the in-kind distribution into the brokerage account could take up to ten days and that Fidelity would wait "until everything move[d] into" the individual retirement and brokerage accounts with Fidelity before transferring it to Goldman Sachs. J.A. 462.

Kelly felt that was too long. He pressed the representative about completing the liquidation and transfer more quickly. The representative repeated that it would take up to

---

[2] From the record before us, it appears that the parties use "in-kind distribution" to mean moving the non-Altria stock from the 401(k) account into the Fidelity brokerage account.

ten days but, after Kelly expressed more frustration, the representative said, "the liquid portion, you're right, it would just take a day or two and then once it's available, you can move that out." J.A. 464.

The Fidelity representative then transferred Kelly and the Goldman Sachs advisors to a different Fidelity representative to liquidate the Altria stock and the U.S. Index Fund holdings. That same day—November 2, 2020—Fidelity processed Kelly's request to sell his holdings in Altria stock and the Index Fund.

On November 5, 2020, three business days later, Kelly and his Goldman Sachs advisors called Fidelity to continue the liquidation process. A Fidelity representative said that for the in-kind distribution, Fidelity would quote Kelly up to seven to ten business days, although the representative said he couldn't "imagine that takes that long." J.A. 488.

On November 10, 2020, Kelly and his Goldman Sachs advisor spoke again with Fidelity about the status of the in-kind distribution. The Fidelity representatives told them that Fidelity could not transfer the proceeds of the Altria stock and U.S. Index Fund sales to Goldman Sachs until the in-kind distribution was completed, which they said would take several more business days. Kelly expressed frustration, explaining that he did not understand why the in-kind distribution needed to be completed for him to access the other funds and had not been told that this was the case. Kelly said that, had Fidelity "properly communicated . . . that [his] money was going to be out of the market for three weeks, [he] would have made different decisions." J.A. 246. On November 12, 2020, Fidelity completed the cash rollover and the in-kind distribution.

6

For a couple of years, Kelly went back and forth with Altria about his frustrations with this situation. Ultimately, Altria treated Kelly's complaints as a formal claim under the plan. And Altria also advised Kelly of its claims appeal process and his rights to bring a civil action under ERISA.

Altria, the plan administrator, denied Kelly's claim. After reviewing Kelly's call logs to Fidelity, Altria concluded that Fidelity told Kelly that it could take up to ten business days to complete the in-kind distribution and the cash rollover. Altria also found that Fidelity completed both the in-kind distribution and the cash rollover within five business days of the stock sale settling, which was well within the timelines quoted for completion of those tasks.

As the plan allowed, Kelly appealed the denial to Altria's Management Committee for Employee Benefits. The management committee upheld the decision. It concluded that Kelly was told that the in-kind distribution could take seven to ten business days and that Fidelity processed Kelly's transactions consistent with the promised timelines.

Kelly then sued Altria, the plan and Fidelity in federal district court. He brought four claims: (1) Altria and the plan deprived him of his right to ERISA benefits under 29 U.S.C. § 1132(a)(1)(B); (2) Altria and the plan failed to provide a full and fair review of his ERISA claim under the same statute; (3) Altria, the plan and Fidelity breached their fiduciary duties under 29 U.S.C. § 1132(a)(3); and (4) Altria failed to provide Kelly a plan document—the Administrative Services Agreement (ASA) between Fidelity and Altria as the plan administrator—under 29 U.S.C. § 1132(a)(1)(A).

All three defendants—Altria and the plan jointly, and Fidelity separately—moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The district court granted Kelly's voluntarily dismissal of Count Two but otherwise denied Altria's and Fidelity's motions in full. After discovery, the parties filed cross-motions for summary judgment.

The district court granted the defendants' motions and denied Kelly's. As to Count One, the deprivation of benefits claim, it concluded that the management committee's decision-making process was reasoned, principled and considered the relevant materials. The court noted that Fidelity completed the in-kind distribution and the cash rollover on November 12, 2020, "within the time frame quoted for the rollover of the cash and well before the time frame quoted for the rollover of the in-kind stock." J.A. 1146. It further concluded that Kelly "recognized" that the Fidelity representative's comment on the November 2 call—to the effect that the cash rollover would be complete in a few days— was "only [a] speculative estimate[]." J.A 1145.

As to Count Three, the breach of fiduciary duty claim, the court found that Fidelity was not acting as a fiduciary when it advised him on how to send his assets to Goldman Sachs. But even if it was, the court said, Fidelity did not breach any duty because it provided Kelly with accurate information as to options and timing and completed the requests within the stated timeframes.

Finally, as to Count Four, Kelly's claim for statutory penalties under ERISA against Altria for withholding a copy of the ASA, the court reasoned that the agreement did not

provide information about Kelly's benefits or rights and thus "Altria was under no obligation to provide the ASA to [Kelly] upon his request." J.A. 1164.

Kelly appealed, challenging each of these decisions.[3]

## II.

We start with Count One—Kelly's denial of benefits claim.[4] ERISA allows a participant in a qualifying benefits plan to sue to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). How such a claim is reviewed, however, depends on whether the plan gives the administrator discretion in considering questions about benefits. If it does, we review for abuse of discretion. *See Fortier v. Principal Life Ins. Co.*, 666 F.3d 231, 235 (4th Cir. 2012). Here, the plan gives the plan administrator the "discretionary power to determine all questions that arise under the Plan," including "the amount of any benefit to which any person is entitled to under the Plan." J.A. 380; *see also* J.A. 296 (defining the administrator as "the Plan administrator

---

[3] After the district court granted the defendants' motions for summary judgment, the defendants sought attorney's fees. Altria and the plan only sought fees for their work in litigating Counts One and Three. The district court awarded them fees, concluding that Kelly bore some culpability in protracting the length of the litigation by baselessly denying the accuracy of certain telephone call transcripts. But the court denied Fidelity's motion with leave to refile due to deficiencies in its supporting documentation. Later, the district court awarded fees to Fidelity after the parties stipulated to an amount. Kelly's appeal of those fees is consolidated with his appeal of the order and judgment. We have jurisdiction to review under 28 U.S.C § 1291.

[4] We review the district court's grant of summary judgment de novo. *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 20 (4th Cir. 2014). But we apply the same standards employed by the district court in considering the plan administrator's decision. *Id.*

and the Named Fiduciary with respect to such management and administrative duties within the meaning of ERISA"); J.A. 364 (naming the administrator as a fiduciary responsible for "general administration of the Plan"). So, we consider whether Altria abused its discretion in denying Kelly's claim. *See Fortier*, 666 F.3d at 235.

The abuse of discretion standard is "highly deferential" to the plan administrator. *Cosey v. Prudential Ins. Co. of Am.*, 735 F.3d 161, 168 (4th Cir. 2013). We "must not disturb the administrator's decision if it is reasonable, even if the court itself would have reached a different conclusion." *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir. 1996). The reasonableness of a decision is measured by examining whether it is a product of a "deliberate, principled reasoning process" and "supported by substantial evidence." *Griffin v. Hartford Life & Accident Ins. Co.*, 898 F.3d 371, 381 (4th Cir. 2018) (quoting *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010)). Substantial evidence means "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011) (quoting *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984)).

To determine whether Altria's decision is supported by substantial evidence, we may consider a nonexhaustive list of factors we set out in *Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000). These factors are

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the

10

exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.* at 342–43.

Kelly insists he was not initially told that the two parts of his transaction were connected or that he would not have access to the proceeds from the liquidation of his Altria stock and his U.S. Index Fund until his non-Altria in-kind distribution was complete. He also argues that the management committee failed to adequately account for the transcripts, audio recordings and internal notes of some of his calls with Fidelity Representatives. And he argues that, based on these failures, the third, fifth and sixth *Booth* factors all weigh in favor of finding that Altria abused its discretion in denying his claim for benefits and that the district court erred in finding otherwise.

We agree with the district court that Altria did not abuse its discretion in denying Kelly's claim. The management committee gave Kelly the opportunity to submit materials in support of his claim. Then, in a deliberative meeting, it considered the relevant transcripts of the calls between Kelly and Fidelity, as well as the evidence Kelly submitted on his alleged damages. Much of this information was contained in an extensive PowerPoint presentation on the various facts and issues concerning the claim.

The management committee considered Kelly's argument that he was not told he could not access the proceeds from liquidating Altria stock or the index fund until the in-kind distribution of the non-Altria stock was complete. It also recognized that on November 2, a Fidelity representative told Kelly "that the rollover would take only a day or two following the settlement period for the sale of Altria stock." J.A. 744. But the management

11

committee determined that Kelly was later told "that the cash rollover to the Fidelity IRA would take approximately three to five business days, and that the in-kind distribution could take seven to ten business days." J.A. 742. As the management committee observed, Fidelity met these timelines.

Considering the entire record, as well as the *Booth* factors, Altria's decision was reasonable. Thus, it did not abuse its discretion in denying Kelly's claim for benefits under § 1132(a)(1)(B).[5]

### III.

Next, we consider Count Three—Kelly's breach of fiduciary claim. Kelly argues that the district court erred in finding that Fidelity was not an ERISA fiduciary.[6] He maintains that by advising him on how to transfer his assets from Fidelity to Goldman Sachs and communicating with him about his benefits, Fidelity acted as a fiduciary. And

---

[5] While Kelly also argues that Altria's dual role of evaluating and paying ERISA claims and the involvement of an Altria employee in both the informal and formal resolution of his claim created a conflict of interest in this case, "any conflict of interest is considered one factor, among many, in determining the reasonableness of the discretionary determination." *Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 359 (4th Cir. 2008). In our view, any conflict of interest is not dispositive because the remaining *Booth* factors sufficiently support Altria's determination.

[6] Although he originally brought claims against both Altria and Fidelity, Kelly's arguments on appeal focused only on whether Fidelity is a fiduciary and whether it breached its fiduciary duty. Op. Br. at 43–46. So, any claims against Altria are forfeited. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999) (noting that a party abandons an argument on appeal that it does not raise in its opening brief). But even if they weren't, they would fail for the same reasons we describe as to the claim against Fidelity.

12

he argues that its purportedly false representations about when he would have access to the proceeds of his stock and mutual fund sales breached that duty.

ERISA permits a civil action by a participant, beneficiary or fiduciary "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). The Supreme Court has interpreted this provision to allow for a breach of fiduciary duty claim. *See Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 384 (4th Cir. 2001) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 507–15 (1996)). And we have recognized that an ERISA fiduciary can breach its duty to a beneficiary by failing to provide material information. *See id.* at 381. But, of course, "[t]o allege a breach of any such fiduciary duty, a plan participant or beneficiary must first establish 'that the party charged with the breach' is, in fact, a fiduciary." *Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d 269, 275 (4th Cir. 2019) (quoting *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 60 (4th Cir. 1992)). Thus, Kelly's appeal raises two questions—(1) was Fidelity a fiduciary, and (2) if it was, did its statements to Kelly during the phone calls in November 2020 breach that duty?

"ERISA contemplates two general types of fiduciaries." *Dawson-Murdock,* 931 F.3d at 275. The first is the "named fiduciary." *Id.* (quoting 29 U.S.C. § 1102(a)(2)). This is the fiduciary referenced in the plan documents with authority to administer the plan. *Id.* Here, the plan names Altria's "Vice President, Compensation, Benefits and HR Services" as the administrator of the plan. J.A. 296 (identifying that position as the "Named Fiduciary

13

with respect to such management and administrative duties within the meaning of ERISA"). Kelly doesn't claim Fidelity is the named fiduciary.

The second type of fiduciary is a "functional fiduciary." *Dawson-Murdock,* 931 F.3d at 276 (quoting *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 357 n.6 (4th Cir. 2014)). Even if not named as a fiduciary in the plan, a person or entity may be a functional fiduciary

> to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

*Id.* (quoting 29 U.S.C. § 1002(21)(A)). To sum that up, anyone who "*de facto* performs specified discretionary functions with respect to the management, assets, or administration of a plan" may be a functional fiduciary. *Id.* (quoting *Custer v. Sweeney*, 89 F.3d 1156, 1161 (4th Cir. 1996)). Kelly claims the record shows that Fidelity acted as a functional fiduciary.

To examine this argument, we begin with the plan documents. The plan gives the appropriate fiduciary "full power and discretionary authority to determine all matters arising in the administration, interpretation and application of the Plan." J.A. 380; *see also* J.A. 296. And, while the plan names various fiduciaries with more specific responsibilities, it names the administrator as the fiduciary vested with "general administration of the Plan." J.A. 364. The plan does not name Fidelity as a fiduciary. *See* J.A. 364–68. Rather, the plan gives the administrator the authority to delegate or assign its authority to carry out certain

14

responsibilities with respect to the plan. J.A. 364. And the plan states that the administrator has "assigned certain duties to the Third-Party Recordkeeper and the Participating Companies." J.A. 296. According to the plan, Fidelity is this third-party recordkeeper and was "retained to provide ministerial recordkeeping and administrative functions under the Plan as documented in a separate [ASA]." J.A. 323.

The ASA directs Fidelity to perform a variety of ministerial recordkeeping services within the framework of the plan. Those include answering calls and other communications from Altria and the plan's participants, fulfilling literature requests, responding to inquiries about the plan, providing fund balances and answering questions about investment performance. Without diminishing the importance of those functions, the agreement correctly identifies them as ministerial. So, carrying out those responsibilities doesn't make Fidelity a functional fiduciary.

Kelly says that, even if this is so, the way Fidelity performed those duties made it a functional fiduciary. Specifically, he argues Fidelity's communications to him and his Goldman Sachs advisors about the process and timing of liquidating his 401(k) account amounted to performing discretionary functions. It is true that "conveying information about plan benefits to a beneficiary in order to assist plan-related decisions can constitute fiduciary activity." *Dawson-Murdock*, 931 F.3d at 280. But by the time Kelly reached out to Fidelity, he had already decided he no longer wanted to participate in the plan. Specifically, he had already decided to move the proceeds of his 401(k) account to Goldman Sachs. In fact, he had his advisors from Goldman Sachs on the phone during his conversations with Fidelity. So, this is not a case in which Fidelity's provision of

15

information guided an "informed choice about continued participation" in the plan. *Varity*, 516 U.S. at 502.

Kelly says that, nonetheless, Fidelity gave him advice on the best way to carry out the transfer. And it is true that the Fidelity representatives were aware that Kelly wanted to liquidate and transfer his funds in a way that allowed him to take advantage of the net unrealized appreciation tax benefits. But the standard information the representative gave Kelly was only pertinent to carrying out the decision that Kelly already made. Thus, this still fell short of a "discretionary function[] with respect to the management, assets, or administration of a plan." *Custer*, 89 F.3d at 1161.

Still, even if Fidelity was at least a functional fiduciary, Fidelity breached no duty to Kelly. It accurately estimated the time it would take to liquidate the Altria stock and to complete the in-kind distribution for the non-Altria stock. And the financial transactions occurred within those estimated timeframes. Fidelity didn't give any investment or strategic advice. It made no guarantees. It simply responded to Kelly's questions.

True, at one point, one of Fidelity's representatives said, "the liquid portion, you're right, it would just take a day or two and then once it's available, you can move that out." J.A. 464. Perhaps that could be construed to suggest Kelly could have accessed the proceeds of the Altria stock before the in-kind distribution of the non-Altria stock was completed. But this stray comment was sandwiched between several statements that the transaction would take seven to ten days—an estimate that was repeated by other Fidelity

16

representatives, without objection from Kelly, in later conversations. Less than perfect customer service? Perhaps. Breach of fiduciary duty? No.[7]

## IV.

Lastly, we reach Kelly's claim that Altria's failure to provide him a copy of the ASA warranted statutory penalties under 29 U.S.C. § 1024(b)(4). Under that provision, upon written request of a participant, a plan administrator must furnish a copy of the "contract, or other instrument[] under which the plan is established or operated." *Id.* "[A] district court may, in its discretion, assess penalties . . . against plan administrators who fail to furnish requested documents that are required to be furnished by" § 1024(b)(4). *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 659 (4th Cir. 1996); 29 U.S.C. § 1132(c)(1).

---

[7] We also affirm the award of attorney's fees. The district court awarded attorney's fees to Altria and the Plan under 29 U.S.C. § 1132(g)(1) in the amount of $76,131. It also awarded Fidelity $46,820 in fees following a stipulation by the parties. Kelly does not challenge the amount of fees awarded. He argues that the district court abused its discretion by awarding fees at all, claiming the district court misapplied the test from *Quesinberry v. Life Insurance Co. of North America*, 987 F.2d 1017 (4th Cir.1993) (en banc). He insists that the district court did not properly consider that the fee request came from a prevailing defendant against an individual claimant. But the statute, by its plain text, gives the district court discretion to award a "reasonable attorney's fee and costs of action *to either party*." 29 U.S.C. § 1132(g)(1) (emphasis added); *see also Plasterers' Loc. Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 221–22 (4th Cir. 2011). Kelly also argues the district court failed to properly apply the *Quesinberry* factors and failed to consider the remedial purposes of ERISA and its fee analysis. But we find the district court adequately considered these factors. And its analysis of Kelly's request for special deference reflects the court's awareness of the "remedial purposes of ERISA to protect employee rights and secure effective access to federal courts." *Quesinberry*, 987 F.2d at 1029 (quoting *Reinking v. Phila. Am. Life Ins. Co.*, 910 F.2d 1210, 1218 (4th Cir. 1990), *overruled in part on other grounds*, *Quesinberry*, 987 F.2d 1017). Having balanced those concerns along with the relevant factors, including Kelly's culpability and ability to pay the fee award, the district court did not abuse its discretion in awarding attorney's fees. *See Williams*, 609 F.3d at 635–36.

Altria denied Kelly's request for the ASA, saying that the ASA was not a document that governs plan participants and, therefore, was not an instrument under which the plan was established or operated. The district court agreed with Altria's position, concluding that while the agreement was a relevant document, it did not establish the operation or management of the plan itself. The court concluded that the agreement "simply memorialize[d] Fidelity's obligations to provide certain services to Altria." J.A. 1163.

In reviewing this issue, "[a]s always, we begin with the text" of the statute. *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022). The key language from the statute is "under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). To interpret that phrase, we must discern the "ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020).

One way to do that is by examining "dictionaries published close in time to when [the statute] was enacted." *Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 129 (4th Cir. 2023). We begin with the word "establish," which meant the same thing at the time ERISA was enacted as it means now—"to set up on a firm or permanent basis; institute; found." *Establish*, The American College Dictionary (1970); *see also Establish*, Oxford Advanced Learner's Dictionary of Current English (3d ed. 1974) ("set up, put on a firm foundation"); *Establish*, Webster's New World Dictionary of the American Language (2d Coll. ed.1974) ("to cause to be or happen; bring about"). Using those definitions, the plan was not set up or instituted by the agreement. In fact, the opposite is true. The plan set up or instituted the agreement.

18

Turning next to "operate," when ERISA was passed, it meant, again as it still does today, "to work or run, as a machine does," "to perform some process of work or treatment," or to "carry on transactions in securities, or some commodity, esp. speculatively or on a large scale." *Operate*, The American College Dictionary (1970). It also means "to manage or use (a machine, etc.) at work," for example, "to operate a switch board." *Id.* (italics omitted); *see also Operate*, Oxford Advanced Learner's Dictionary of Current English (3d ed. 1974) ("(cause to) work, be in action, have an effect; manage"); *Operate*, Webster's New World Dictionary of the American Language (2d Coll. ed.1974) ("to be in action so as to produce an effect; act; function; work").

These definitions tell us that a document under which a plan operates is one that governs some part of the plan's process. To examine whether the agreement does that, we return to its terms. Recall that the ASA directs Fidelity to answer calls and communicate with Altria and the plan participants, fulfill literature requests, take customer services calls, respond to inquiries about the plan, provide fund balances and answer questions about investment performance. And it calls for Fidelity to provide data and transaction management. Recall also that those duties are ministerial, not discretionary. But the meaning of "operate" doesn't hinge on that distinction. It hinges on whether the duties help the plan work or perform part of its process. And they do. So, the ASA was a document under which the plan operated.

Altria insists that our decision in *Faircloth* dictates otherwise. We disagree. There, we considered whether certain letters, appraisal reports, meeting minutes and other policies were the sorts of documents a participant would be entitled to under § 1024(b)(4).

19

*Faircloth*, 91 F.3d at 652. We explained that "[t]he clear and unambiguous meaning of this statutory language encompasses only formal or legal documents under which a plan is set up or managed." *Id.* at 654. That, we said, did not encompass the stock appraisal reports and trustee meeting minutes at issue in that case. *Id.* at 655. But it did encompass funding and investment policies because they "set forth [] obligations to fund the [plan] and explain[ed] the responsibilities regarding investing the assets of the [plan]." *Id.* at 656. Relevant here, *Faircloth* holds that while "documents that provide information about the plan and benefits" may not fall within the ambit of the statute, ones "under which the plan is established or operated" do. *Id.* at 654 (quoting 29 U.S.C. § 1024(b)(4)).[8] Thus, Kelly was entitled to a copy of the ASA.

## V.

For the foregoing reasons, we affirm the district court in all respects except for its ruling on Kelly's claim for statutory penalties under 29 U.S.C. §1024(b)(4). As to that claim, we reverse and remand for the district court to determine whether statutory penalties are appropriate.

---

[8] Our conclusion is consistent with reported decisions from our sister circuits. *See M. S. v. Premera Blue Cross*, 118 F.4th 1248, 1267 (10th Cir. 2024) (holding that the Administrative Services Agreement there fell within the meaning of §1024(b)(4)'s disclosure requirements because the plan was "'established and operated' under the ASA" because it created a system by which benefit claims were submitted to a third-party claims administrator rather than to the plan administrator directly (quoting § 1024(b)(4))); *Mondry v. Am. Fam. Mut. Ins. Co.*, 557 F.3d 781, 796 (7th Cir. 2009) (holding that § 1024(b)(4) required the production of a claims administration agreement because, in defining the respective roles of the plan and claims administrators, the agreement "govern[ed] the operation of the Plan" even if it did not define what rights and benefits were available to the Plan's participants or beneficiaries).

*No. 25-1350 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED;*
*No. 25-2080 AFFIRMED*